# Illinois Official Reports

## Appellate Court

---

**Sienna Court Condominium Ass'n v. Champion Aluminum Corp.,**
2017 IL App (1st) 143364

---

| | |
|---|---|
| Appellate Court Caption | SIENNA COURT CONDOMINIUM ASSOCIATION, an Illinois Not-for-Profit Corporation, Plaintiff-Appellant, v. CHAMPION ALUMINUM CORPORATION, a New York Corporation d/b/a Champion Window and Door; BV AND ASSOCIATES, INC., a Michigan Corporation d/b/a Clearvisions, Inc.; WOJAN WINDOW AND DOOR CORPORATION, a Michigan Corporation; MATSEN FORD DESIGN ASSOCIATES, INC., a Wisconsin Corporation; WALLIN-GOMEZ ARCHITECTS, LTD., an Illinois Corporation; HMS SERVICES INC., an Illinois Corporation d/b/a HMS Engineering; LICHTENWALD-JOHNSTON IRON WORKS COMPANY, an Illinois Corporation; METALMASTER ROOFMASTER INC., an Illinois Corporation; DON STOLTZNER MASON CONTRACTOR, INC.; TEMPCO HEATING AND AIR CONDITIONING COMPANY; MTH ENTERPRISES LLC, an Illinois Limited Liability Corporation d/b/a MTH Industries; NGU INC., a New York Corporation d/b/a Champion Architectural Window and Door; TR SIENNA PARTNERS, LLC, an Illinois Limited Liability Company; ROSZAK/ADC, LLC, an Illinois Limited Liability Company, Defendants (Champion Aluminum Corporation, BV and Associates, Inc., Wojan Window and Door Corporation, Matsen Ford Design Associates, Inc., Wallin-Gomez Architects, Ltd., and HMS Services Inc., Defendants-Appellees; Lichtenwald-Johnston Iron Works Company, Metalmaster Roofmaster Inc., Don Stoltzner Mason Contractor, Inc., Tempco Heating and Air Conditioning Company, Defendants-Appellees and Counter-Defendants-Appellees; Roszak/ADC, LLC, Defendant and Counter-Plaintiff-Appellant). |
| District & No. | First District, Sixth Division<br>Docket Nos. 1-14-3364, 1-14-3687, 1-14-3753 |

| | |
|---|---|
| Filed | February 17, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-L-2053; the Hon. Margaret A. Brennan, Judge, presiding. |
| Judgment | Affirmed and certified questions answered. |
| Counsel on Appeal | Arnstein & Lehr, LLP, of Chicago (Hal R. Morris, Justin L. Weisberg, Raymond N. Krauze, Elizabeth A. Thompson, and Joseph L. Hoolihan, of counsel), for appellant Sienna Court Condominium Association.<br><br>Cassiday Schade, LLP, of Chicago (Julie A. Teuscher, Thomas P. Boylan, and Michael P. Moothart, of counsel), for appellant Roszak/ADC, LLC.<br><br>Hinshaw & Culbertson, LLP, of Chicago (Kimberly A. Jansen, Steven R. Bonanno, and Anne C. Couyoumjian, of counsel), for appellee Don Stoltzner Mason Contractor, Inc.<br><br>Franco & Moroney, LLC, of Chicago (Robert J. Franco and Christopher M. Cano, of counsel), for appellee Metalmaster Roofmaster, Inc.<br><br>Cremer, Spina, Shaughnessy, Jansen & Siegert, LLC, of Chicago (Brian Shaughnessy, of counsel), for appellee Lichtenwald-Johnston Iron Works, Co.<br><br>O'Donnell Haddad, LLC, of Libertyville (Robert T. O'Donnell and Adam Kingsley, of counsel), for appellee Tempco Heating and Air Conditioning Co.<br><br>Perl & Goodsnyder, Ltd., of Chicago (Christopher M. Goodsnyder, of counsel), for appellee BV and Associates, Inc.<br><br>Kearns Law Firm, LLC, of Chicago (Christopher R. Kearns, of counsel), for appellee Champion Aluminum Corp. |

SmithAmundsen, LLC, of Chicago (Michael Resis and David A. Johnson, of counsel), for appellee Wojan Window and Door Corp.

Clausen Miller, P.C., of Chicago (Kimberly A. Kearney and Margaret H. Fahey, of counsel), for appellee Matsen Ford Design Associates.

Foran, Glennon, Palandech, Ponzi & Rudloff, PC, of Chicago (Thomas B. Orlando, Douglas J. Palandech, and Madelene G. Sheaffer, of counsel), for appellee HMS Services, Inc.

Adler, Murphy & McQuillen, LLP, of Chicago (Lawrence S. Gosewisch, Thomas S. Flanigon, and Jason T. Meares, of counsel), for appellee Wallin-Gomez Architects, Ltd.

Panel          JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Presiding Justice Hoffman and Justice Delort concurred in the judgment and opinion.

## OPINION

¶ 1      This opinion addresses three consolidated appeals, all arising from the plaintiff condominium association's lawsuit alleging defects in the design and construction of a condominium development in Evanston, Illinois.

¶ 2      The first appeal concerns whether claims for breach of the implied warranty of habitability may be asserted against design professionals and material suppliers who otherwise did not actually perform construction work. We hold that these claims were properly dismissed.

¶ 3      A second appeal asks us to resolve a number of related certified questions, asking whether a property owner may assert a claim of breach of implied warranty of habitability against a subcontractor of an admittedly insolvent developer or general contractor. We answer those questions in the negative.

¶ 4      In the third appeal, the condominium development's general contractor (which is insolvent and has been dissolved) appeals the dismissal of its counterclaims against various entities, asserted long after its dissolution. We hold that the counterclaims were properly dismissed.

¶ 5                          BACKGROUND

¶ 6      These consolidated appeals arise from alleged defects in the design and construction of a condominium development known as Sienna Court Condominiums in Evanston, Illinois (Sienna Court). Sienna Court was developed by TR Sienna Partners, LLC (the developer), who

was named as a defendant but is not a party to this appeal. Roszak/ADC, LLC (Roszak), an Illinois limited liability company, acted as the general contractor for the project.[1]

¶ 7    Sienna Court was designed by entities including Wallin-Gomez Architects, Ltd. (Wallin-Gomez) and two engineering firms, HMS Services Inc. (HMS), and Matsen Ford Design Associates, Inc. (Matsen) (together, the design defendants).

¶ 8    In addition, Roszak contracted with numerous subcontractors to construct Sienna Court, including: Don Stoltzner Mason Contractor, Inc. (Stoltzner); Metalmaster Roofmaster Inc. (Metalmaster); Lichtenwald-Johnston Iron Works Co. (Lichtenwald); Tempco Heating and Air Conditioning Co. (Tempco); and BV and Associates, Inc., d/b/a Clearvisions, Inc. (Clearvisions) (collectively, the subcontractors).

¶ 9    Separately, Champion Aluminum Corporation (Champion) and Wojan Window and Door Corporation (Wojan) (together, the material suppliers) provided materials for Sienna Court's window wall systems, spandrel units, and window units. Notably, unlike the subcontractors, the material suppliers did not install such materials at Sienna Court or otherwise perform construction work.

¶ 10    Prior to April 2009, the developer sold Sienna Court's condominium residential units to individual purchasers. The Sienna Court Condominium Association, the plaintiff herein, is comprised of the owners of the individual condominium residences at Sienna Court. Sienna Court was turned over from the developer to the plaintiff in April 2009.

¶ 11    According to their discovery responses, the developer and Roszak were insured for liability with respect to the Sienna Court project by two insurers; each insurer's policy provided coverage in the amount of $1 million per occurrence and an aggregate limit of $2 million. These insurers are providing coverage in this action under a reservation of rights.

¶ 12    In June 2009, Roszak filed a Chapter 7 petition in the United States Bankruptcy Court for the Northern District of Illinois (bankruptcy court). In its bankruptcy petition, when asked to disclose any "contingent and unliquidated claims of every nature, including *** counterclaims of the debtor, and rights to setoff claims," Roszak responded that there were none. In July 2010, Roszak was involuntarily dissolved by the Illinois Secretary of State for failure to file an annual report. Separately, the developer was dissolved and declared bankrupt in February 2010.

¶ 13    On February 26, 2013, the plaintiff condominium association filed a verified complaint, alleging various defects in the Sienna Court condominiums, including defects in the windows and roofs that allowed water infiltration and resulted in property damage. The complaint asserted claims of breach of implied warranty of habitability against certain of the design defendants, material suppliers, and subcontractors, including Clearvisions, Wojan, Champion, Stoltzner, Metalmaster, Lichtenwald, Wallin-Gomez, and Matsen.

¶ 14    The complaint specially pleaded that the developer and Roszak had filed for bankruptcy protection in May 2009 and that on May 5, 2009, "The Bankruptcy Court issued discharges to [the developer and Roszak] *** having found that, in each case, [the developer and Roszak] were insolvent and had no assets with which to pay the claims of unsecured creditors."

---

[1]The plaintiff alleges that the same individual, Thomas Roszak, was a co-owner of both the developer and Roszak.

[2]As discussed below, *Pratt III* was the third decision by our court in a number of related appeals arising from breach of warranty of habitability claims asserted by the same plaintiff condominium

- 4 -

¶ 15    On April 19, 2013, the plaintiff filed a first amended complaint, adding a breach of implied warranty claim against Tempco. The first amended complaint also named the developer, Roszak, and HMS as respondents in discovery; those three parties were later converted to defendants by order dated October 28, 2013.

¶ 16    On May 3, 2013, the plaintiff filed a motion in the bankruptcy court to reopen Roszak's bankruptcy case and lift the automatic stay "so that the [plaintiff] may proceed against [Roszak] solely for the purpose of recovering from third party, non-debtor insurance companies" to the extent of Roszak's insurance coverage.

¶ 17    On May 16, 2013, the bankruptcy court issued an order, granting the plaintiff's request, reopening Roszak's Chapter 7 case and allowing the plaintiff to pursue its claims against Roszak "solely for the purpose of recovering from third party, non-debtor insurance companies *** that have insurance claims relating to the property" at Sienna Court. It is undisputed that Roszak did not disclose to the bankruptcy court the existence of any potential counterclaims arising from the plaintiff's lawsuit.

¶ 18    On May 13, 2013, the Matsen engineering firm filed a motion to dismiss the implied warranty of habitability claim asserted against it, pursuant to section 2-615 of the Code of Civil Procedure. 735 ILCS 5/2-615 (West 2014). Among other arguments, Matsen contended that no implied warranty of habitability attaches to the services of design professionals. On June 20, 2013, Wallin-Gomez, Sienna Court's architect, filed a similar motion to dismiss, asserting that "claims for breach of implied warranty of habitability do not apply to architect and building designers who do not engage in the construction of the allegedly defective structure."

¶ 19    The plaintiff filed a response to Wallin-Gomez's motion on September 12, 2013. In that response, the plaintiff argued that it could maintain its warranty of habitability claim on the basis of this court's decision in *Minton v. Richards Group of Chicago*, 116 Ill. App. 3d 852 (1983). The plaintiff argued that *Minton* "extends the implied warranty of habitability beyond the builder/vendor where the innocent purchaser has no recourse against the builder/vendor." The plaintiff argued that *Minton* applied to permit recovery against Wallin-Gomez in this case, since the developer and Roszak were dissolved and insolvent, such that the plaintiff had "no recourse" against those entities.

¶ 20    Matsen and Wallin-Gomez's motions were heard on December 10, 2013. On December 10, 2013, the circuit court entered an order dismissing the counts of the plaintiff's complaint against Matsen and Wallin-Gomez. Notably, the December 10, 2013, order specified that, pursuant to Illinois Supreme Court Rule 304(a), there was no just reason to delay appeal. See Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010). However, on January 7, 2014, the trial court vacated its Rule 304(a) finding with respect to the December 10, 2013, dismissal order. It was not until October 29, 2014, that the trial court entered separate orders reinstating the Rule 304(a) findings with respect to the December 10, 2013, dismissal of the claims against Matsen and Wallin-Gomez. On November 26, 2014, the plaintiff filed its notice of appeal from the dismissal of those claims.

¶ 21    On January 27, 2014, the remaining design defendant, HMS, filed a motion to dismiss the plaintiff's implied warranty claim asserted against it, arguing (as had Matsen and Wallin-Gomez) that the implied warranty of habitability did not apply to it. After the parties briefed the motion, HMS's motion to dismiss was granted on June 2, 2014.

¶ 22    Meanwhile, on June 20, 2013, Wojan, one of the material suppliers, filed a section 2-619 motion to dismiss the claim for breach of implied warranty asserted against it. 735 ILCS

5/2-619 (West 2012). Wojan asserted two primary arguments: (1) that it was not subject to a claim for breach of warranty of habitability because it was not a "builder-vendor" and did not perform any construction work, but merely supplied goods and (2) that the plaintiff's claim was untimely pursuant to section 2-725 of the Uniform Commercial Code (UCC) (810 ILCS 5/2-725(1) (West 2012)) because the claim was not brought within four years of Wojan's last delivery of goods for the Sienna Court project. Wojan's motion was supported by an affidavit and invoices for products it had sold to Clearvisions and Roszak, indicating that its last delivery of goods for Sienna Court occurred in November 2007.

¶ 23   On December 31, 2013, the plaintiff filed a second amended complaint, naming the developer and Roszak as defendants and asserting claims for breach of warranty of habitability against them.

¶ 24   In response to the second amended complaint, on January 27, 2014, Wojan filed an amended section 2-619 motion to dismiss, again asserting that (1) the plaintiff's claim was time-barred by section 2-725 of the UCC and (2) that a breach of implied warranty of habitability claim could not be maintained against a defendant that merely supplied goods for the condominium project. Wojan's motion to dismiss was argued at a June 2, 2014, hearing. At that time, the court granted Wojan's motion, citing the four-year statute of limitations period set forth in section 2-725 of the UCC. The court entered a written order on June 2, 2014, granting Wojan's motion to dismiss.

¶ 25   Champion (which was also alleged only to have supplied goods) subsequently filed its own motion to dismiss premised upon the same UCC statute of limitations, attaching invoices and an affidavit indicating that its goods had been delivered no later than June 2006. On October 29, 2014, the court granted Champion's motion to dismiss, specifying that there was no just reason to delay appeal pursuant to Rule 304(a).

¶ 26   After being named as a defendant in the plaintiff's December 2013 second amended complaint, Roszak asserted counterclaims against certain subcontractors and material suppliers, alleging that they performed defective work and supplied defective materials for Sienna Court. On February 26, 2014, Roszak asserted counterclaims including breach of contract, breach of express and implied warranties, and indemnity claims against Lichtenwald, Metalmaster, Stoltzner, Tempco, Clearvision, Wojan, and Champion (collectively, "the counterdefendants).

¶ 27   On May 14, 2014, the counterdefendants filed a joint motion to dismiss Roszak's counterclaims. That motion argued (1) that Roszak had no standing or legal capacity, as a dissolved limited liability company (LLC), to assert counterclaims, (2) that Roszak could not maintain a claim because it was not "the real party in interest," as Roszak "cannot be directly liable to the Plaintiff *** due to the bankruptcy court's order limiting the Plaintiff's potential recovery to [Roszak's] insurance policies," and (3) that Roszak should be judicially estopped from asserting its counterclaims, since Roszak had never disclosed its potential counterclaims as assets in its bankruptcy court filings.

¶ 28   In addition to the joint motion, on July 14, 2014, Wojan filed a supplemental motion to dismiss Roszak's counterclaims against Wojan. That motion asserted that Roszak's counterclaims against Wojan could not be maintained because the plaintiff's underlying claim against Wojan was time-barred by the UCC statute of limitations.

¶ 29　　At a hearing on October 9, 2014, the court indicated that it would grant the joint motion to dismiss Roszak's counterclaims on the basis of the counterdefendant's judicial estoppel argument:

> "So the next issue has to do with when you filed your petition of bankruptcy because I think this is about the most significant and telling thing, and you don't include any assets. These are not unsophisticated parties, and failure to include a counterclaim or potential counterclaim when you're already in litigation at the time you file the bankruptcy is quite telling, and I think that it is, in essence, playing a hide-the-ball with the Court, and therefore judicial estoppel applies, and the motion to dismiss is granted."

¶ 30　　During the same hearing, the court allowed Champion's oral motion to join Wojan's separate motion to dismiss counterclaims based on the UCC statute of limitations. The court proceeded to dismiss Roszak's counterclaims against both Wojan and Champion on that basis.

¶ 31　　On October 29, 2014, the court entered an order dismissing Roszak's counterclaims on the basis of judicial estoppel. In the same order, the court also granted Wojan's and Champion's separate motion to dismiss the counterclaims against them. Thus, with respect to Wojan and Champion, Roszak's counterclaims were dismissed both on the basis of judicial estoppel and on the grounds of the statute of limitations.

¶ 32　　The trial court's order of October 29, 2014, found, pursuant to Rule 304(a), that there was no just reason to delay appeal from the dismissal of Roszak's counterclaims. On November 24, 2014, Roszak filed a notice of appeal. On November 25, Roszak filed an amended notice of appeal from the October 29, 2014, order.

¶ 33　　Meanwhile, on January 27, 2014, certain of the subcontractors and material suppliers—Clearvisions, Lichtenwald, Champion, Metalmaster, Tempco, and Stoltzner (the subcontractor-appellants)—filed the "Subcontractor and Material Supplier Defendants' Joint § 2-619(a) Motion to Dismiss" (the joint motion), seeking dismissal of the implied warranty of habitability claims alleged against them by the plaintiff.

¶ 34　　The subcontractor-appellants recognized our court's 1983 holding in *Minton* that a homeowner may proceed against a subcontractor of the builder vendor, if the builder is insolvent and the purchaser has "no recourse." The joint motion argued that, under *Minton*, the plaintiff could not maintain breach of warranty of habitability claims against the subcontractor-appellants, because the plaintiff still had "recourse" against the developer and Roszak, the general contractor. The joint motion cited the bankruptcy court orders permitting the plaintiff to pursue claims against Roszak and the developer to the extent of their insurance coverage, as well as discovery responses indicating that those entities were insured by two separate insurance policies, each with a per occurrence policy limit of $1 million.

¶ 35　　The plaintiff filed a response on March 12, 2014, which relied largely on a 2013 decision of our court which permitted a condominium association's warranty of habitability claims against a subcontractor, where the developer was insolvent but was alleged to have some assets. See *1324 W. Pratt Condominium Ass'n v. Platt Construction Group, Inc.*, 2013 IL App (1st) 130744 (*Pratt III*).[2] Pursuant to *Pratt III*, the plaintiff argued that whether a property owner could bring claims against a subcontractor for breach of the implied warranty of habitability

---

[2]As discussed below, *Pratt III* was the third decision by our court in a number of related appeals arising from breach of warranty of habitability claims asserted by the same plaintiff condominium association.

depends only on whether the builder is solvent, which "is measured solely by the assets and liabilities of the developer." The plaintiff argued that pursuant to *Pratt III*, the existence of liability insurance was not relevant in deciding whether the developer is "insolvent." Because the developer and Roszak were insolvent, the plaintiff argued it could maintain implied warranty of habitability claims against subcontractors, regardless of potential recovery from the developer and Roszak's insurers.

¶ 36    On April 11, 2014, the subcontractor-appellants filed a reply brief in further support of their joint motion. At the same time, they submitted documents obtained in discovery from the developer which, they contended, proved that the plaintiff had already obtained "recourse" in the form of funds disbursed from the developer's "TR Sienna Partners' Warranty Escrow Fund" (warranty fund), an escrow fund which had been funded by the sale of the condominium units. The subcontractor-appellants cited documents indicating that the plaintiff initially sought such funds in May 2009 in order to repair certain defects and that the plaintiff in January 2010 filed a motion in the developer's bankruptcy case seeking turnover of such escrow funds. The documents indicated that in February 2010, the plaintiff had received approximately $308,000 from the warranty fund. Thus, the subcontractor-appellants asserted that this recovery (in addition to the potential recovery from the developer and Roszak's insurers) was a source of "recourse" to the plaintiff that barred the plaintiff from maintaining its claims against subcontractors pursuant to our holding in *Minton*.

¶ 37    The subcontractor-appellants' joint motion to dismiss was argued on June 2, 2014. On that date, the trial court denied the joint motion to dismiss, citing *Pratt III* and finding that the plaintiff had pleaded that the developer and Roszak were insolvent. However, during the June 2, 2014, hearing, the trial court expressed its belief that appellate court precedents, specifically *Minton* and *Pratt III*, were unclear as to whether "recourse" or "insolvency" determined whether a warranty of habitability claim could be asserted against a subcontractor: "I think unfortunately, the Appellate Court, while they keep trying to supposedly clarify the issue *** the issues get unnecessarily complicated." The court remarked that *Pratt III* "didn't ignore recourse *** but recourse has no bearing at all on the Court's analysis. I still think if you're going to argue that *Minton* is good law, then you have to look that *Minton* talked about insolvency and recourse."

¶ 38    The court noted that this case was "unique" and "factually distinct" from prior cases because the plaintiff had moved the bankruptcy court "to lift the stay so that they can proceed against these insurance proceeds," which had "identif[ied] *** a sum of monies that may be available to address the issues that they have with this building."

¶ 39    Nevertheless, the court denied the joint motion to dismiss, reasoning that "if you take the very straight line approach" that insolvency was the determining factor, "then we are looking at facts that are sufficiently pled to establish an insolvency." However, the court indicated that it would welcome a motion to certify related questions for interlocutory appeal pursuant to Rule 308. The court remarked: "I think the Appellate Court at this juncture would once again struggle between the recourse, no recourse" issue.

¶ 40    On July 3, 2014, the subcontractor-appellants filed a joint motion to certify questions for appeal pursuant to Illinois Supreme Court Rule 308 (eff. Feb. 26, 2010). That motion was argued in a hearing on October 9, 2014. Counsel for the movants argued that the existence of "recourse," as defined in *Minton*, is a substantial factor in whether a subcontractor of a builder may be sued for breach of implied warranty of habitability. In contrast, the plaintiff argued that

pursuant to *Pratt III*, the "insolvency" of the builder or general contractor is the determining factor regarding whether the subcontractor may be sued.

¶ 41 In agreeing to certify questions pursuant to Rule 308, the trial court expressed concern as to whether a plaintiff needs to show that it has "no recourse" against the builder or general contractor in order to proceed against a subcontractor. During the October 9, 2014, hearing, the trial court indicated its belief that *Pratt III* was unclear as to whether "recourse is out of the picture" "because it didn't directly overrule other cases that talked about recourse." The trial court remarked that "If they really believed that insolvency is the only issue ***, then perhaps it needs to be stated as clearly as that. That recourse is—no longer matters so we're moving that from being a component."

¶ 42 On October 29, 2014, the circuit court certified the following four questions:

"a) Does the existence of an insolvent developer's and/or insolvent general contractor's liability insurance policy(ies) bar a property owner from maintaining a cause of action for breach of implied warranty of habitability against subcontractors and/or material suppliers, which are not in privity with the property owner, under *Minton v. Richards*, 116 Ill. App. 3d 852 (1st Dist. 1983) or its progeny?

b) Does the potential recovery against an insolvent developer's and/or insolvent general contractor's liability insurance policy(ies) constitute 'any recourse' under *Minton v. Richards*, 116 Ill. App. 3d 852 (1st Dist. 1983) or its progeny, thereby barring a property owner's cause of action for breach of implied warranty of habitability against subcontractors and/or material suppliers, which are not in privity with the property owner?

c) Does the actual recovery of any proceeds from an insolvent developer's 'warranty fund,' which was funded by the now insolvent developer with a percentage of the sales proceeds from the sale of the property, bar a property owner from maintaining a cause of action for breach of implied warranty of habitability against subcontractors and/or material suppliers, which are not in privity with the property owner, under *Minton v. Richards*, 116 Ill. App. 3d 852 (1st Dist. 1983) or its progeny?

d) Does the actual recovery of any proceeds from an insolvent developer's 'warranty fund' constitute 'any recourse' under *Minton v. Richards*, 116 Ill. App. 3d 852 (1st Dist. 1983) or its progeny, thereby barring a property owner's cause of action for breach of implied warranty of habitability against subcontractors and/or material suppliers, which are not in privity with the property owner?"

On December 11, 2014, our court granted the application for leave to appeal pursuant to Illinois Supreme Court Rule 308.

¶ 43 Meanwhile, on November 26, 2014, the plaintiff filed a notice of appeal seeking reversal of the orders dismissing the claims against the design defendants and material suppliers: the December 10, 2013, order dismissing its claims against Wallin-Gomez and Matsen; the June 2, 2014, order dismissing the plaintiff's claims against Wojan and HMS; and the October 29, 2014, order dismissing its claims against Champion.

¶ 44 These appeals were subsequently consolidated with Roszak's appeal from the order dismissing its counterclaims against the counterdefendants.

¶ 46    We review (1) the plaintiff's appeal from the orders dismissing its claims against the design defendants and material suppliers, (2) the certified questions brought to this court pursuant to Rule 308 with respect to the plaintiff's ability to assert claims against subcontractors pursuant to *Minton* and its progeny, and (3) Roszak's appeal from the dismissal of its counterclaims against the counterdefendants.

¶ 47    We note that, with respect to the plaintiff's appeal from the orders granting the design defendants' and the material suppliers' motions to dismiss, we have jurisdiction pursuant to Rule 304(a), as the court, in orders issued on October 29, 2014, made the requisite findings of no just reason to delay appeal from the corresponding orders of dismissal against these defendants, including the December 10, 2013, order pertaining to Matsen and Wallin-Gomez.[3] See Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010). The plaintiff's November 26, 2014, notice of appeal was thus timely for purposes of appellate jurisdiction.

¶ 48    The first two appeals concern the viability of claims for breach of the implied warranty of habitability. Thus, we review the basis for that cause of action. "[T]he implied warranty of habitability is a 'creature of public policy' that was explicitly designed by our courts 'to protect purchasers of new houses upon discovery of latent defects in their homes.' " *Pratt III*, 2013 IL App (1st) 130744, ¶ 14 (quoting *Redarowicz v. Ohlendorf*, 92 Ill. 2d 171, 183 (1982)).

¶ 49    "The rationale for the application of the policy has been threefold. [Citations.] First, purchasers of new homes generally do not [have] the ability to determine whether the houses they have purchased contain latent defects. [Citation.] Second, [t]he purchaser needs this protection because, in most cases, [he or she] is making the largest single investment of his or her life and is usually relying upon the honesty and competence of the builder, who, unlike the typical purchaser, is in the business of building homes. [Citation.] And finally, [i]f construction of a new house is defective its repair costs should be borne by the responsible builder-vendor who created the latent defect, rather than the innocent and unknowing purchaser. [Citation.]" (Internal quotation marks omitted.) *Id.*

¶ 50    Our court has extended the implied warranty to permit a claim by a condominium purchaser against the developer-seller of a new condominium unit. *Tassan v. United Development Co.*, 88 Ill. App. 3d 581 (1980).

¶ 51    Generally, the claim must be asserted against the builder-vendor. See *Paukovitz v. Imperial Homes, Inc.*, 271 Ill. App. 3d 1037, 1038 (1995) ("In order to prevail, the plaintiff must prove that the defendant was the builder-vendor of the home."). However, our court's 1983 decision in *Minton v. Richards Group of Chicago*, 116 Ill. App. 3d 852 (1983), permitted a breach of implied warranty of habitability claim to be asserted against a subcontractor of the builder-vendor where the purchaser had "no recourse" to the insolvent general contractor. The *Minton* decision is central to several of the arguments asserted in these consolidated appeals.

¶ 52    In *Minton*, the builder-vendor from whom the plaintiffs had purchased their home dissolved as an entity. *Id.* at 853. Prior to its dissolution, the plaintiffs had demanded that the

---

[3]On January 7, 2014, the trial court vacated its original Rule 304(a) finding contained in the December 10, 2013, order dismissing the claims against Matsen and Wallin-Gomez. As the Rule 304(a) findings with respect to the December 10, 2013, dismissal of those claims was not reinstated until October 29, 2014, the plaintiff's November 26, 2014, notice of appeal was timely with respect to its challenge to the dismissal of its claims against Matsen and Wallin-Gomez.

builder-vendor correct peeling paint from the home's eaves and windows; the builder failed to remedy the issue. *Id.* The plaintiffs' original complaint sued the builder-vendor for violation of the implied warranty of habitability. *Id.* Following the builder-vendor's dissolution, the plaintiffs filed an amended complaint pleading a claim of breach of implied warranty of habitability against the subcontractor of the builder-vendor who had painted the home. *Id.*

¶ 53    The trial court granted the subcontractor's motion to dismiss the amended complaint. *Id.* at 854. On appeal, the plaintiffs contended that the implied warranty of habitability "applies to the subcontractors of the builder-vendor where the builder-vendor is dissolved and shows no assets." *Id.*

¶ 54    The *Minton* court reversed and permitted the implied warranty claim against the subcontractor. The court recognized that the "[t]he purpose of the warranty is to protect purchasers' expectations by holding builder-vendors accountable." *Id.* (citing *Redarowicz v. Ohlendorf*, 92 Ill. 2d 171 (1982)). The court further recognized that it was being "asked to extend the warranty of habitability to the subcontractors of a builder-vendor where the builder-vendor has been dissolved as an entity and is insolvent." *Id.* The court agreed to do so, reasoning: "Purchasers from a builder-vendor depend upon his ability to construct and sell a home of sound structure and his ability to hire subcontractors capable of building a home of sound structure. The plaintiffs here had no control over the choice of [the builder-vendor] to paint the eaves and windows of their home, and [the builder-vendor] was in the better position to know which subcontractor could perform the work adequately." *Id.* at 854-55. We concluded: "we hold that in this case where the innocent purchaser has no recourse to the builder-vendor and has sustained loss due to the faulty and latent defect in their new home caused by the subcontractor, the warranty of habitability applies to such subcontractor." *Id.* at 855.

¶ 55    With this background in mind, we turn to the various substantive contentions regarding the implied warranty of habitability claims in these appeals now consolidated before us. First, we review and affirm the trial court's orders of dismissal of the plaintiff's implied warranty of habitability claims against the design defendants.

¶ 56    The dismissal of the design defendants was granted pursuant to section 2-615 of the Code of Civil Procedure. 735 ILCS 5/2-615 (West 2014). Thus, we review the dismissals *de novo* to assess whether the plaintiff's allegations pleaded a viable claim for relief. See *Illinois Insurance Guaranty Fund v. Liberty Mutual Insurance Co.*, 2013 IL App (1st) 123345, ¶ 14.

¶ 57    We note that, as urged by the design defendants, the issue of whether the implied warranty extends to such defendants as themselves was explored thoroughly in a factually similar 2015 opinion, in which we held that such claims could not be asserted against an architect. *Board of Managers of Park Point at Wheeling Condominium Ass'n v. Park Point at Wheeling, LLC*, 2015 IL App (1st) 123452 (*Park Point*). We agree with the design defendants that *Park Point* is dispositive and supports dismissal of the claims against them.

¶ 58    In *Park Point*, the plaintiff, a condominium association, asserted breach of implied warranty of habitability claims against the condominium project's architect (and other defendants) in connection with alleged latent defects in the design, materials, and construction of the condominiums which allowed water and air infiltration to cause damage. *Id.* ¶ 4. However, "[t]he architect [was] not alleged to have taken part in the construction or sale of the units." *Id.* ¶ 2.

¶ 59    The plaintiff further alleged "that the developer-seller was insolvent" and incapable of satisfying the estimated $4 million cost of repairs. *Id.* ¶ 4. The plaintiff claimed that "it had no recourse against the original general contractor, because that entity was insolvent and no longer doing business, and had no recourse against the successor general contractor" because it "had either no assets or insufficient assets" to satisfy the estimated cost of repairs. *Id.*

¶ 60    After reviewing case law regarding the implied warranty, *Park Point* recognized that, "generally speaking, only builders or builder-sellers warrant the habitability of their construction work. Engineers and design professionals *** provide a service and do not warrant the accuracy of their plans and specifications. [Citations.]" *Id.* ¶ 15.

¶ 61    We also noted that "breach of implied warranty of habitability claims against design professionals have [largely] been rejected in Illinois and most other jurisdictions." *Id.* ¶ 16. For example, our court approvingly cited the decision by our court's Third District in *Paukovitz v. Imperial Homes, Inc.*, 271 Ill. App. 3d 1037 (1995), which held that a breach of implied warranty of habitability claim could not be maintained against a home designer who only supplied materials and plans but did not participate in construction. *Park Point*, 2015 IL App (1st) 123452, ¶ 16. In *Park Point*, we recited the *Paukovitz* court's reasoning:

> " 'It is undisputed that [the designer] Imperial did no construction work on Paukovitz' home. It only supplied the shell materials and the plans which [the builder] then used to construct the residence. The parties do not cite, and we are unable to find, any reported cases in which a court held that the supplier of plans and shell materials was a builder-vendor for the purposes of the implied warranty of habitability. *** Inasmuch as Imperial did not contribute to the actual construction of Paukovitz' home, we find that it was not a builder-vendor which could be held liable for the breach of the implied warranty of habitability.' " *Id.* (quoting *Paukovitz*, 271 Ill. App. 3d at 1039).

¶ 62    After summarizing additional cases from a number of other states that declined to apply warranty claims against architectural and engineering firms, *Park Point* stated: "two principles become clear from the case law. First, the implied warranty of habitability of construction is traditionally applied to those who engage in construction. Second, architects do not construct structures, they perform design services pursuant to contracts *** and courts have consistently declined to heighten their express contractual obligations by implying a warranty of habitability of construction." *Id.* ¶ 22.

¶ 63    In support of its argument that the warranty should extend to the defendant architect, the plaintiff in *Park Point* relied on our holding in *Minton*, which had extended the warranty to a subcontractor where the builder-vendor was insolvent and the plaintiffs otherwise had "no recourse." *Minton*, 116 Ill. App. 3d at 855. Similar to the plaintiff's arguments in this case, the condominium association in *Park Point* argued that "the work of the general contractors (builders) and subcontractors *** is similar to the work of architects" as "fault in the efforts of either a contractor or an architect may create latent defects *** and that the public policy underlying the implied warranty of habitability of construction work is to protect new homeowners from latent defects by holding the responsible party liable." *Park Point*, 2015 IL App (1st) 123452, ¶ 24.

¶ 64    *Park Point* recognized that, in *Minton*, we found "that the implied warranty of habitability should be extended to the subcontractor *** where the buyers had no recourse against the insolvent builder-seller." *Id.* ¶ 26 (citing *Minton*, 116 Ill. App. 3d at 855). However, our opinion in *Park Point* concluded that "*Minton* is properly limited to subcontractors *** that

have helped with the physical construction or the construction-sale of the property. \*\*\* Property buyers such as the plaintiffs in *Minton* 'depend upon [the builder-seller's] ability to construct and sell a home of sound structure and his ability to hire subcontractors capable of building a home of sound structure.' " *Id.* ¶ 27 (quoting *Minton*, 116 Ill. App. 3d at 854).

¶ 65    *Park Point* reasoned that "[t]he role that the [architect] had in erecting the subject condominiums did not create a dependent relationship with the buyers like the one that existed in *Minton.*" *Id.* We further held that "[t]he fact that the builders of the subject condominium complex are now alleged to be insolvent does not justify expanding *Minton*'s holding to an entirely different category of defendant." *Id.* As there was "no allegation that this architect took part in the construction or the construction-sale of real property," we concluded that "this architect should not be subject to the implied warranty of habitability of construction." *Id.*

¶ 66    In this case, we find that our recent opinion in *Park Point* is well-reasoned and is dispositive with respect to the plaintiff's appeal from the trial court's dismissal of the implied warranty claims against the design defendants. As in *Park Point*, we reject the plaintiff's argument that we should expand the extent of the implied warranty of habitability to a new class of defendants who designed, but were not involved in the actual construction of, the condominiums at issue.

¶ 67    *Park Point* is also dispositive of the plaintiff's argument that *Minton* should be extended to the design defendants in this case due to the insolvency of the general contractor and Roszak. In *Park Point*, the plaintiff similarly argued for expansion of *Minton* on the basis of the developer's insolvency. *Id. Park Point* nevertheless held that the fact of insolvency did not justify expanding potential liability for breach of the warranty of habitability where there was "no allegation that [the] architect took part in the construction or the construction-sale of real property." *Id.*

¶ 68    We find no reason to depart from our precedent, including *Park Point*, which makes clear that an architect or engineering firm that assisted in design but otherwise did not participate in the construction of the real property is *not* subject to the implied warranty of habitability. Thus, we affirm the trial court's orders dismissing the plaintiff's warranty claims against the three design defendants—Wallin-Gomez, HMS, and Matsen.

¶ 69    We further conclude that the same precedent supports the dismissal of the plaintiff's claims against the material supplier defendants, Champion and Wojan. Those defendants moved to dismiss pursuant to section 2-619 of the Code, which "admits the legal sufficiency of the plaintiff's claim but asserts defects or defenses outside the pleading that defeat the claim." *Id.* ¶ 33. We review a dismissal pursuant to section 2-619 *de novo. Id.*

¶ 70    Champion and Wojan's motions sought dismissal based on application of the relevant statute of limitations under section 2-725(1) of the UCC, as well as arguing that an implied warranty of habitability claim could not be asserted against them because they did not perform construction work. The record indicates that the trial court granted Wojan and Champion's motions to dismiss primarily because it agreed that the claims were time-barred. As we are mindful that we may affirm dismissal on the basis of any ground apparent from the record (see *In re Detention of Duke*, 2013 IL App (1st) 121722, ¶ 11), we find that the defendants' status as material suppliers is sufficient to affirm the dismissal of the implied warranty claims against them.

¶ 71    Significantly, the relevant allegations of the plaintiff's complaint pleaded only that Champion and Wojan "supplied" materials used in the window wall systems, spandrel units,

and window units of the Sienna Court condominiums. Wojan and Champion argue that they performed no construction work and thus cannot be considered the equivalent of the builder-vendor for purposes of the doctrine of implied warranty of habitability. We agree. Based on the same precedent discussed with respect to the design defendants, the implied warranty of habitability does not extend to material suppliers who did not perform any construction. Our precedent is clear that liability is limited to parties who actually "took part in the construction or construction-sale." *Park Point*, 2015 IL App (1st) 123452, ¶ 27. Although *Park Point* concerned an architect, the same principle applies.

¶ 72    Moreover, our Third District's decision in *Paukowitz*, 271 Ill. App. 3d 1037, whose reasoning we reaffirmed in *Park Point*, specifically held that a supplier of materials was not subject to a claim for implied warranty of habitability where it was not disputed that the defendant "did no construction work" but "only supplied the shell materials and the plans *** used to construct the residence." *Id.* at 1039.

¶ 73    Although we recognize that *Paukowitz* did not discuss the solvency of the builder-vendor, we again reiterate our agreement with *Park Point*'s statement that "[t]he fact that the builders of the subject condominium complex are now alleged to be insolvent does not justify expanding *Minton*'s holding to an entirely different category of defendant." *Park Point*, 2015 IL App (1st) 123452, ¶ 27. Similarly, we do not interpret *Minton* as support for expanding liability for the implied warranty of habitability to an entirely new category of defendants—material suppliers who were not involved in constructing the property. As we concluded in *Park Point*, "*Minton* is properly limited to subcontractors *** that have helped with the physical construction or the construction-sale of the property." *Id.*

¶ 74    The plaintiff does not raise any argument to convince us to depart from the reasoning of *Paukowitz* and *Park Point* to extend liability for the implied warranty of habitability to material suppliers who had no additional role in constructing or selling the plaintiff's residence. On that basis, we affirm the trial court's June 2, 2014, order to the extent it dismissed the plaintiff's implied warranty of habitability claim against Wojan, as well as the October 29, 2014, order dismissing the implied warranty of habitability claim against Champion. As we affirm on this basis, we need not discuss the material suppliers' alternative argument that dismissal was warranted under the applicable Uniform Commercial Code statute of limitations.

¶ 75    We next address the questions certified to us following the trial court's denial of the subcontractor-appellants' joint motion to dismiss the plaintiff's claims against them on the basis of *Minton* and its progeny. We first note that we have jurisdiction to address these questions pursuant to Rule 308, which allows "permissive appeal of an interlocutory order certified by the trial court as involving a question of law as to which 'there is substantial ground for difference of opinion' and 'where an immediate appeal may materially advance the ultimate termination of the litigation.' " *Pratt III*, 2013 IL App (1st) 130744, ¶ 11 (quoting Ill. S. Ct. R. 308 (eff. Feb. 26, 2010)). "As with all questions of law, we review questions presented for interlocutory appeal under a *de novo* standard." *Id.*

¶ 76    We address the following four questions certified by the circuit court:

   "a) Does the existence of an insolvent developer's and/or insolvent general contractor's liability insurance policy(ies) bar a property owner from maintaining a cause of action for breach of implied warranty of habitability against subcontractors

and/or material suppliers, which are not in privity with the property owner, under *Minton v. Richards*, 116 Ill. App. 3d 852 (1st Dist. 1983) or its progeny?

b) Does the potential recovery against an insolvent developer's and/or, insolvent general contractor's liability insurance policy(ies) constitute 'any recourse' under *Minton v. Richards*, 116 Ill. App. 3d 852 (1st Dist. 1983) or its progeny, thereby barring a property owner's cause of action for breach of implied warranty of habitability against subcontractors and/or material suppliers, which are not in privity with the property owner?

c) Does the actual recovery of any proceeds from an insolvent developer's 'warranty fund,' which was funded by the now insolvent developer with a percentage of the sales proceeds from the sale of the property, bar a property owner from maintaining a cause of action for breach of implied warranty of habitability against subcontractors and/or material suppliers, which are not in privity with the property owner, under *Minton v. Richards*, 116 Ill. App. 3d 852 (1st Dist. 1983) or its progeny?

d) Does the actual recovery of any proceeds from an insolvent developer's 'warranty fund' constitute 'any recourse' under *Minton v. Richards*, 116 Ill. App. 3d 852 (1st Dist. 1983) or its progeny, thereby barring a property owner's cause of action for breach of implied warranty of habitability against subcontractors and/or material suppliers, which are not in privity with the property owner?"

¶ 77 In summary, the certified questions ask whether a homeowner's claim for breach of the implied warranty of habitability may proceed against subcontractors and material suppliers of an admittedly insolvent developer or general contractor when either (1) the plaintiff has a potential source of recovery pursuant to the insurance policies of the insolvent entities or (2) where the plaintiff has already recovered proceeds from the insolvent property developer's "warranty fund."

¶ 78 As we have already ruled that property owners have no breach of implied warranty action against a mere material supplier, we will address the certified questions only as they relate to subcontractors. As recognized by the trial court and the parties' briefs, all of these certified questions arise from a basic disagreement as to whether the viability of an implied warranty of habitability claim against a subcontractor depends upon an inquiry into whether the plaintiff has "no recourse" against the developer or general contractor, as that phrase was used in *Minton*, or if the applicable test is whether the developer or general contractor is insolvent, pursuant to our decision in *Pratt III*. As set forth below, we find that our case law, particularly our decision in *Pratt III*, is clear and dispositive that insolvency is the determinative factor. That precedent compels us to answer each of the certified questions in the negative.

¶ 79 The subcontractor-appellants' arguments rely primarily on *Minton*, which permitted the plaintiffs to seek recovery against a subcontractor where the builder was insolvent and thus the homeowner had "no recourse" to seek recovery from the builder. *Minton*, 116 Ill. App. 3d at 855 ("[W]e hold that in this case where the innocent purchaser has no recourse to the builder-vendor *** the warranty of habitability applies to such subcontractor.").

¶ 80 The subcontractor-appellants argue that, in this case, it cannot be said that the plaintiff has "no recourse" against the insolvent developer or Roszak due to (1) the plaintiff's potential recovery from the developer and general contractor's insurers and (2) evidence that the plaintiff has already recovered approximately $308,000 from the developer's warranty escrow fund. In turn, they argue that the *Minton* "no recourse" exception is not implicated, and so the

- 15 -

plaintiff is precluded from seeking recovery against the developer or general contractor's subcontractors.

¶ 81    However, our 2013 decision in *Pratt III*, 2013 IL App (1st) 130744, makes clear that the insolvency of the builder is the determining factor in whether a claim may proceed against such a subcontractor. *Pratt III* was the third opinion from our court stemming from the claims of a plaintiff condominium association against the general contractor (Platt) and one of its subcontractors, EZ Masonry. In a 2009 opinion, we reversed a trial court order granting Platt's motion to dismiss, as we concluded that " 'the [implied] warranty [of habitability] applies to builders of residential homes regardless of whether they are involved in the sale of the home.' " *Id.* ¶ 5 (quoting *1324 W. Pratt Condominium Ass'n v. Platt Construction Group, Inc.*, 404 Ill. App. 3d 611, 618 (2010) (*Pratt I*)).

¶ 82    Following remand and a subsequent appeal, we issued a 2012 opinion "holding that so long as Platt remained solvent, the condominium association could not proceed against EZ Masonry." *Id.* ¶ 8 (citing *1324 W. Pratt Condominium Ass'n v. Platt Construction Group, Inc.*, 2012 IL App (1st) 111474 (*Pratt II*)).

¶ 83    On remand from that decision, the plaintiff filed an amended complaint against both Platt and EZ Masonry, adding allegations that Platt was insolvent. *Id.* ¶ 9. After limited discovery, the circuit court held that Platt was " 'insolvent, but remains a corporation in good standing with limited assets.' " *Id.* The circuit court also held that the relevant date for determining the insolvency of a general contractor is the date on which the complaint is filed against the general contractor. *Id.*

¶ 84    The circuit court then certified two questions for interlocutory appellate review. The first certified question concerned whether the relevant date for determining the insolvency of a general contractor was the date a complaint was filed against the general contractor or when the construction was completed. *Id.* Second, and particularly relevant to this appeal, the circuit court certified the question of whether the condominium association could pursue its claim against subcontractor EZ Masonry when the builder, Platt, was " 'insolvent, but is in good standing with limited assets.' " *Id.*

¶ 85    With respect to the second question, EZ Masonry, citing *Minton* and other decisions, argued that "it would be unfair to permit the condominium association to pursue its claim against EZ Masonry where Platt is a viable corporation that has succeeded in defending itself in this ligation for years." *Id.* ¶ 19. Citing *Minton* and subsequent decisions of our court, EZ Masonry argued that there was "uncertainty as to whether the determining factor in whether a purchaser can proceed against a subcontractor is 'solvency,' 'no recourse' or 'the viability' of a corporation." *Id.* However, our court "strongly disagree[d]" and held that insolvency was the determining factor. *Id.* We held: "The law in Illinois is clear. An innocent purchaser may proceed on a claim for the breach of the implied warranty of habitability against a subcontractor where the builder-vendor is insolvent." *Id.* ¶ 20.

¶ 86    *Pratt III* reviewed our holdings in *Minton* and subsequent decisions of our court and found that they consistently held that the developer or general contractor's insolvency was the key factor in determining whether the purchaser can proceed against a subcontractor for breach of the implied warranty of habitability. The court recognized that in *Washington Courte Condominium Ass'n-Four v. Washington-Golf Corp.*, 150 Ill. App. 3d 681 (1986), our court concluded that "the *Minton* exception did not apply" to permit claims against subcontractors, where, under the record of that case, " 'the allegation of [the general contractor's] insolvency

[was] 'legally unsubstantiated and [was] a matter *de hors* the record.' " *Pratt III*, 2013 IL App (1st) 130744, ¶ 22 (quoting *Washington Courte*, 150 Ill. App. 3d at 689). However, *Pratt III* emphasized that "nothing in *Washington Courte* negates the position that 'insolvency' of the general contractor is the determining factor in establishing whether a purchaser can proceed against a subcontractor on a breach of implied warranty of habitability claim." *Id.*

¶ 87    *Pratt III* also noted that in *Dearlove Cove Condominiums v. Kin Construction Co.*, 180 Ill. App. 3d 437 (1989), we held that a plaintiff "could proceed against the subcontractor even if he failed to file the complaint within the applicable statute of limitations so long as the action was timely filed against the general contractor" before the general contractor became insolvent. *Pratt III*, 2013 IL App (1st) 130744, ¶ 23. *Pratt III* emphasized that *Dearlove Cove* "reiterated that *Minton* stood for the proposition that a purchaser can proceed against a subcontractor if a builder-vendor is 'insolvent.' " *Id.* (citing *Dearlove Cove*, 180 Ill. App. 3d at 439-40).

¶ 88    Our *Pratt III* decision also recalled that in *Pratt II*, "under the record we had before us then, which included no allegations regarding Platt's insolvency, we held that the condominium association could not proceed against EZ Masonry 'while it still had recourse against Platt.' [Citation.] In doing so, we specifically held that unlike the developer, *** Platt was solvent. [Citation.]" *Id.* ¶ 24.

¶ 89    *Pratt III* then held:

"Under the aforementioned precedent, which we find to be consistent, we hold and clarify that for purposes of determining whether a purchaser may proceed against a subcontractor on a breach of implied warranty of habitability claim, the court must look to whether the general contractor is solvent. Insolvency simply means that a party's liabilities exceed the value of its assets, and that it has stopped paying debts in the ordinary course of business. [Citation.] It is the burden of the purchaser to establish that the general contractor is insolvent before it can proceed against the subcontractor on such a claim." *Id.* ¶ 25.

¶ 90    Under *Pratt III*'s facts, we concluded that, since the circuit court found that the general contractor was " 'insolvent, but is in good standing with limited assets,' " we were "compelled to conclude that the condominium association may proceed with its breach of the implied warranty of habitability claim against EZ Masonry." *Id.* ¶ 26.

¶ 91    On appeal, the subcontractor-appellants assert various arguments seeking to undermine *Pratt III*'s emphasis on insolvency; they maintain that the possibility of "recourse" against the developer or general contractor is the determining factor in deciding whether subcontractors are subject to liability for the implied warranty of habitability. They proceed to argue that since the rationale for extending the implied warranty beyond a property's builder and developer is to ensure that innocent purchasers have a remedy, it is unnecessary to extend the warranty to subcontractors here because the developer and Roszak's insurance coverage and the warranty fund provide the plaintiff with a remedy.

¶ 92    The subcontractors-appellants contend that *Pratt III* "did not eliminate the 'no recourse' requirement." Their brief acknowledges that decision, but they urge that it did not substitute an "insolvency" test in place of a "no recourse" inquiry. They contend that *Pratt III*'s analysis "was limited to the question of solvency" because the certified question in that case "was limited to the question of whether *Minton* applies where a developer, though insolvent, nevertheless has limited assets." They contend that "[t]he availability of 'recourse' simply was not presented" to the *Pratt III* court, such that *Pratt III* is not controlling.

¶ 93    We find this argument unpersuasive. *Pratt III* specifically addressed and rejected the suggestion that there was "uncertainty as to whether the determining factor in whether a purchaser can proceed against a subcontractor is 'solvency,' 'no recourse' or 'the viability' of a corporation." *Id.* ¶ 19. *Pratt III* strongly disagreed with that suggestion and unequivocally stated that "we hold and clarify that for purposes of determining whether a purchaser may proceed against a subcontractor on a breach of implied warranty of habitability claim, the court must look to whether the general contractor is solvent." *Id.* ¶ 25. With this emphatic language, *Pratt III* left no doubt that insolvency, rather than an inquiry into "recourse," determines whether such a claim may be asserted against a subcontractor.

¶ 94    Alternatively, the subcontractor-appellants urge that "an 'insolvency test does not further the purpose of the *Minton* exception." They argue that extending the implied warranty to subcontractors will be "unnecessary" in cases where the insolvent builder has insurance, as recovery from an insurer is sufficient to protect innocent purchasers. Conversely, they suggest that the "insolvency" test is not ideal to protect home purchasers, as there may be cases where a builder or developer with few liabilities may remain "solvent," despite having insufficient assets to compensate an innocent purchaser's potential damages. Thus they insist that a "no recourse" test is superior.

¶ 95    We disagree. *Pratt III* stated a clear, bright-line rule that the relevant inquiry is the insolvency of the developer or general contractor. Under *Pratt III*, "It is the burden of the purchaser to establish that the general contractor is insolvent before it can proceed against the subcontractor" on an implied warranty of habitability claim. *Id.* Further, *Pratt III* defined insolvency to mean that a party's liabilities exceed the value of its assets and that the party has stopped paying its debts in the ordinary course of business. *Id.* We find that adhering to the clear, unambiguous rule in *Pratt III* is superior to applying a more ambiguous, fact-intensive inquiry into whether a purchaser has "recourse" to the developer or general contractor. As illustrated by the facts of this case, determining the viability of a claim against a subcontractor by reference to a more ambiguous "recourse" standard is made difficult by the numerous factual scenarios and arguments that could be raised to suggest that the plaintiff has some form of "recourse." As noted by the trial court and demonstrated by this case, litigating questions under a "recourse" test lends itself to confusion, unpredictable results, and the expenditure of large amounts of time and resources by the parties and the courts. We believe that the insolvency test, as set forth in *Pratt III* and reaffirmed here, provides guidance that can be much more easily applied by our courts and that will also provide parties with more certainty and predictability.

¶ 96    We note that the subcontractors-appellants alternatively argue that *Minton* should be overruled in its entirety, essentially arguing that implied warranty claims should *never* be permitted against subcontractors. In support, the subcontractor-appellants argue that courts outside the First District have rejected *Minton*, citing the Fourth District's decision in *Lehmann v. Arnold*, 137 Ill. App. 3d 412 (1985), and the Second District's decision in *Bernot v. Primus Corp.*, 278 Ill. App. 3d 751 (1996).

¶ 97    The subcontractors further argue that extending the implied warranty of habitability to subcontractors does not further the original purpose of the implied warranty, to hold builder-vendors accountable given the dependent relationship of the builder and the home purchaser. They argue that extending such liability to subcontractors who have no direct relationship with the purchaser of the property, does not serve the fundamental basis for the

implied warranty. In other words, they contend that subcontractors' duties should be limited by their contracts and that it is unfair to expose them to liability to purchasers "with whom they have never negotiated contract terms." Thus they urge us to overrule *Minton*.

¶ 98 We decline to deviate from *Minton* and over 30 years of subsequent precedent from this court, which has consistently held that a home purchaser may proceed against the subcontractor of an insolvent developer/builder or general contractor for breach of the implied warranty of habitability. As explained in *Pratt III*, our decisions since *Minton* have deemed it appropriate to protect purchasers through this avenue of recovery and that insolvency is a clear and appropriate measure by which to determine when a homeowner may seek recovery from a subcontractor who contributed to alleged defects. We do not find that the subcontractor appellants have offered any convincing reason to depart from this precedent.

¶ 99 As we reaffirm *Pratt III*'s holding that insolvency is the determinative test—and each of the four certified questions asks whether a claim is barred against the subcontractor of an *insolvent* entity—we answer each of the certified questions in the negative. In other words, with respect to the first two questions, we do not find that *potential* recovery from insurance policies held by an *insolvent* developer or *insolvent* general contractor precludes an implied warranty of habitability claim against subcontractors who participated in the construction of the residence. Similarly, with respect to the third and fourth questions, we do not find that the recovery of any proceeds from an *insolvent* developer's "warranty fund" bars a property owner from maintaining a cause of action for breach of implied warranty of habitability against subcontractors of the developer who participated in the construction of the residence.

¶ 100 We now turn to Roszak's appeal from the trial court's order of October 29, 2014, dismissing its counterclaims against the counterdefendants.

¶ 101 The trial court dismissed the counterclaims under the doctrine of judicial estoppel, citing Roszak's failure to disclose such counterclaims as assets in its bankruptcy filings. The trial court apparently did not express any views on the merits of the additional arguments asserted by the counterdefendants: that Roszak's dissolution deprived it of legal capacity to assert counterclaims or that it was not the real party in interest because it did not stand to gain any actual benefit from the counterclaims.

¶ 102 We again note that a *de novo* standard of review applies. Further, although the trial court premised dismissal on the doctrine of judicial estoppel, we are mindful that we can affirm dismissal on any grounds apparent from the record. See *In re Detention of Duke*, 2013 IL App (1st) 121722, ¶ 11 ("A section 2-619 dismissal is reviewed *de novo*. [Citation.] We may affirm the dismissal of a complaint on any ground that is apparent from the record. [Citation.]"). As we conclude that Roszak lacked legal capacity as a dissolved LLC to assert its counterclaims, we affirm the dismissal of its counterclaims without need to reach the additional arguments raised by the parties.

¶ 103 The parties do not dispute that Roszak is governed by the provisions of the Limited Liability Company Act (Act). See 805 ILCS 180/1-1 *et seq.* (West 2014). Section 35-1 of the Act provides that an LLC that "is dissolved, and, unless continued pursuant to subsection (b) of Section 35-3, *its business must be wound up*," upon the occurrence of certain events, including "Administrative dissolution under Section 35-25." (Emphasis added.) 805 ILCS 180/35-1 (West 2014). Section 35-25 provides that the Secretary of State shall dissolve an LLC upon certain events, including failure to file an annual report. *Id.* There is no dispute that Roszak

was, in fact, dissolved by the Secretary of State on this basis in 2010, and there is no suggestion that Roszak has ever been reinstated since that time.

¶ 104　　Section 35-3(a) of the Act provides that "Subject to subsections (b) and (c) of this Section, a limited liability company continues after dissolution *only for the purpose of winding up its business*." [4] (Emphasis added.) 805 ILCS 180/35-3(a) (West 2014).

¶ 105　　Section 35-4 of the Act, regarding the "Right to wind up [a] limited liability company's business," further provides, in relevant part:

　　　　"(c) A person winding up a limited liability company's business may preserve the company's business or property as a going concern *for a reasonable time*, prosecute and defend actions and proceedings, whether civil, criminal, or administrative, settle and close the company's business, dispose of and transfer the company's property, discharge the company's liabilities, distribute the assets of the company pursuant to Section 35-10, settle disputes by mediation or arbitration, and perform other necessary acts." (Emphasis added.) 805 ILCS 180/35-4(c) (West 2014).

¶ 106　　Notwithstanding its July 2010 dissolution, Roszak contends that it maintained legal capacity to sue in February 2014 by taking an expansive view of the scope and duration of its "winding up" process. That is, Roszak asserts that its counterclaims in February 2014 constituted part of the "winding up" of its affairs.

¶ 107　　Roszak argues that the Act "contains no limitation as to the time for *** winding up" and "provides no definition of the activities included in the winding up" of an LLC. Roszak notes that whereas the Business Corporation Act of 1993 specifies that a dissolved corporation may pursue civil remedies only up to five years after the date of dissolution (805 ILCS 5/12.80 (West 2014)), the Act "contains no limitations on a dissolved LLC's right to wind up its business either substantively or temporally" and contains no specific time limit on a dissolved LLC's right to sue. Thus, Roszak urges that it had no time limit to sue following its dissolution in July 2010.

¶ 108　　As further support for its position, Roszak refers to rules of statutory construction, citing the principle that courts look to the plain meaning of the statutory language as the best indication of legislative intent. See *JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.*, 238 Ill. 2d 455, 461 (2010). Roszak argues: "The LLC Act specifically provides that a dissolved LLC continues after dissolution for the purpose of winding up the LLC's business. That language is clear and without limitation. Had the legislature desired to place any substantive or temporal limitation on the dissolved LLC's right to wind up its business *** it would have done so." In its reply, Roszak similarly argues that to set a limit on its right to sue would violate the principle that a court may not depart from the plain statutory language by reading into it exceptions or limitations. See *Brunton v. Kruger*, 2015 IL 117663, ¶ 24.

¶ 109　　We disagree. Although Roszak is correct that the Act does not state an exact time limit in which a dissolved LLC must complete "winding up," Roszak's claim that the Act "contains no limitations" is undermined by section 35-4(c)'s statement that "[a] person winding up a limited liability company's business may preserve the company's business or property as a going concern *for a reasonable time*." (Emphasis added.) 805 ILCS 180/35-4(c) (West 2014). In this regard, we note the principle that a "statute should be read as a whole and construed so that no

---

[4]None of the parties contends that either subsection (b) or (c) of section 35-3 of the Act is implicated in this case.

term is rendered superfluous or meaningless." (Internal quotation marks omitted.) *JPMorgan Chase Bank*, 238 Ill. 2d at 461. Further, we are mindful that we will not presume that the legislature intended an absurd result. *Land v. Board of Education of the City of Chicago*, 202 Ill. 2d 414, 422 (2002).

¶ 110  We recognize that section 35-4 of the Act specifies certain activities—including prosecuting civil claims—that the LLC may take after dissolution. However, we think it is disingenuous to suggest that the legislature intended for such rights to continue indefinitely following dissolution. Notably, the language regarding the right of a dissolved LLC to sue is in the same passage as language indicating that winding up means keeping the business going for a *reasonable* time. 805 ILCS 180/35-4(c) (West 2014). We believe it would be incongruous and illogical to infer that the General Assembly intended to limit the continuation of a dissolved LLC's business for a reasonable time but that a dissolved LLC would maintain the power to sue and be sued indefinitely. See *Land*, 202 Ill. 2d at 422 ("Words and phrases should not be construed in isolation, but interpreted in light of other relevant provisions of the statute so that, if possible, no term is rendered superfluous or meaningless."). Viewing the statute as a whole, we believe that the legislature contemplated that a dissolved LLC could sue or be sued for a "reasonable time" after dissolution. In any event, we find that the plain meaning of the statutory phrase "winding up" clearly contemplates a finite period in which the LLC's affairs (including the resolution of litigation) are completed. Obviously, a dissolved LLC cannot be "winding up" indefinitely. By the same token, we cannot accept Roszak's position that there was no time limit on its ability to sue following dissolution.

¶ 111  We recognize the apparent lack of case law discussing the outer limit of time by which an LLC may bring a lawsuit or counterclaim following its dissolution. However, we find it would be illogical to permit such suits to be asserted beyond a reasonable time. We do not purport to set forth a bright line rule as to what constitutes a "reasonable time." However, under the undisputed facts of this case, we cannot say that the lengthy gap between the July 2010 dissolution and February 2014 counterclaims constituted a reasonable time.[5]

¶ 112  Finally, Roszak argues in the alternative that, if it had no legal capacity to assert counterclaims as a dissolved LLC, then it had no capacity to be sued by the plaintiff, requiring dismissal of the plaintiff's claims against Roszak. First, we note that this argument does not appear in Roszak's July 18, 2014, response to the counterdefendants' motion to dismiss the counterclaims. As it was not raised before the trial court, that argument is forfeited for purposes of this appeal. See *In re Marriage of Epting*, 2012 IL App (1st) 113727, ¶ 27 ("Generally, issues concerning an alleged error not raised in the trial court are forfeited and may not be raised for the first time on appeal."). In any event, Roszak's suggestion that it could not be sued by the plaintiff ignores the undisputed record evidence that in 2013, the plaintiff expressly sought and obtained approval from the bankruptcy court to sue Roszak and the developer in this action.

¶ 113  Finally, we note that since we conclude that dismissal of the counterclaims against all counterdefendants was warranted due to Roszak's lack of legal capacity, we need not analyze

---

[5]Moreover, as the record indicates that Roszak remained an insolvent debtor subject to the authority of the bankruptcy court, including an automatic stay of pending litigation, we note the lack of any indication that Roszak ever sought approval from the bankruptcy court to assert any counterclaims.

the UCC's statute of limitations (810 ILCS 5/2-725(1) (West 2012)), which also served as the basis for the trial court's dismissal of the counterclaims against Wojan and Champion.

¶ 114     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County and answer the certified questions in the negative as to subcontractors.

¶ 115     Affirmed and certified questions answered.